## IN THE COURT OF APPEALS OF IOWA

No. 23-0486
Filed October 11, 2023

## IN THE MATTER OF THE GUARDIANSHIP OF E.B.

**M.T. and T.T.,**
Appellants.
_____

Appeal from the Iowa District Court for Henry County, Jonathan Stensvaag,
District Associate Judge.

Guardians of a minor child appeal the order terminating the guardianship.
**AFFIRMED.**

Diana Miller and Katelyn Kurt of Whitfield & Eddy, PLC, Des Moines, for
appellants.

David Burbidge of Johnston, Stannard, Klesner Burbidge & Fitzgerald PLC,
Iowa City, for appellee.

Considered by Bower, C.J., and Ahlers and Chicchelly, JJ.

**CHICCHELLY, Judge.**

Guardians of a minor child appeal the order terminating a guardianship established without parental consent. They contest the evidence showing the guardianship should be terminated. Because the reasons for the guardianship no longer exist and the guardians failed their burden of showing the guardianship should not be terminated, we affirm.

**I. Background Facts and Proceedings.**

This appeal is about the guardianship of E.B., who was born in August 2020. E.B.'s mother, B.B., was seventeen years old when she gave birth to him. The circumstances of the pregnancy and birth were traumatic for B.B.,[1] and she struggled with her mental health. Although B.B. met E.B.'s needs, she admits it was difficult for her to provide consistent day-to-day care. As B.B. testified about this period, "Mentally, I was not good."

When E.B. was born, B.B. lived with her brother and E.J., the mother of his children. B.B. relied on E.J. for help in caring for E.B. When E.J. was temporarily unable to help in December 2020, B.B. left E.B. in the care of M.W. and T.W.[2] for a few days.

---

[1] Messages exchanged between B.B. and M.W. make it clear that B.B. values her privacy and has not shared the details surrounding her pregnancy with many people. In her own words, "it's [her] business." It is also clear that discussing those details causes B.B. to relive the trauma. For these reasons, and because the details are not relevant to the outcome of this appeal, no further explanation is warranted. We refer to the traumatic nature of the events only because it is relevant to B.B.'s state of mind following E.B.'s birth and her decision to pursue a guardianship for him.

[2] M.W. is E.J.'s cousin, and T.W. is M.W.'s husband.

Three days after picking E.B. up, B.B. sent M.W. a message[3] saying that she felt E.B. was happier in their home:

> ever since he came back, he doesn't seem as happy as he used to be, and that breaks my heart. he's happy here, but not as happy as i seen in that photo that you sent [E.J.]. and that's all i want is for him to be happy. and [E.J.] also said that your youngest was right by him the whole time before he left with us, and if he makes you guys happy, and you guys make him happy. then that's all i want.

In her response, M.W. stated her family was interested in adopting E.B. but wanted the process to go through the agency formerly known as the Iowa Department of Human Services "because of the fear of you continuing to change your mind."

For ten days, B.B. and M.W. exchanged messages about M.W. and T.W. adopting B.B. With M.W.'s urging, B.B. left E.B. with the couple before they initiated guardianship proceedings. A few days later, M.W. messaged B.B. to express some concerns about how taking E.B. in was "going to cost so much more than we really thought" and asking if B.B. had considered an adoption agency to find a placement for E.B. But three days after that, M.W. messaged B.B. that all was "going great" and they were giving an attorney a retainer "for guardianship, signing parental rights away, and us being to eventually adopt."

M.W. and T.W. petitioned for guardianship of E.B. in March 2021. They filed an affidavit signed by B.B. giving her consent to the appointment of M.W. and T.W. as co-guardians for E.B. The affidavit states, "[M.W.] and [T.W.] have filed a petition for appointment of Guardian for E.B. because I am personally unable to

---

[3] All messages quoted in this opinion come from Exhibit K, which contains some redactions. Although we make minor formatting changes to improve readability, we have not specified where the redactions appear, altered the parties' idiolect, or used "sic" to note any errors.

care for him; I feel that they are better able to see to E.B.['s] needs than myself."

Two months later, the juvenile court granted the petition and appointed M.W. and T.W. co-guardians of E.B.

After the court established E.B.'s guardianship, B.B. asked M.W. for visits with E.B. The guardians agreed to allow B.B. a two-hour visit every other Sunday. Those visits took place at M.W. and T.W.'s home, under their supervision.

The visitation arrangement strained the relationship between B.B. and the guardians. In the first year, B.B. was unable to attend some visits because of work or transportation issues.[4] At first, M.W. would accommodate B.B.'s visits, but that willingness was short-lived. A September 2021 message exchange between B.B. and M.W. is illustrative:

> M.W.: I need to know about tomorrow… if I don't hear back I'm gonna assume u aren't making it
> B.B.: i'm still trying to get it off… so i can, and i also have a gender reveal party to go to as well. i'm stressed out at work right now, so i will let you know when i can.
> M.W.: That's fine… I just wanted u to know if I don't hear from u today, I'm going to assume u aren't because I can't wait around all day tomorrow waiting…. And in the future, I need to know by Friday because like I said before, we will make other plans…..
> B.B.: understandable. but sometimes things come up, when you don't expect it to. like my schedule is subject to change, so if it changes, there's nothing i can really do about it, until i find someone to work for me, which is hard right now, because we are very low staff.
> M.W.: Which I also understand….but u know the Sunday's u come and I have things do also and it's not fair for us to have to wait til the last minute to know whether u are coming….. I am willing to give u til Friday before to know… that's all I'm asking….
> M.W.: And the only reason I ask to know by Friday is because I leave the entire day open so it can be around your schedule…

---

[4] B.B. explained that because she worked as a manager, she had to fill in when other employees missed their shifts. Until July 2022, B.B. did not have a vehicle of her own and relied on friends and family to drive her around twenty-five miles to the visits.

B.B.: i get that, but i tell my managers and district manager that i need sunday's off, and it does not always happen that way.

B.B.: so i apologize

B.B.: and i cannot lose my job, until i get a new one

M.W.: And that's sucks and I apologize But I need to know by Friday's, if I don't, we may not be home…. And I don't want u to be upset….

B.B.: like i said…. i will try

B.B.: it's sometimes impossible

B.B.: you do understand

B.B.: that i cannot go with a job correct?

B.B.: without *

B.B.: you need money to survive

B.B.: to live basically

M.W.: I do understand [B.B.]…. But u need to understand that u don't work 24 hrs on Sunday and I'm not putting my entire day on hold every other Sunday if u aren't coming….. let me know by Friday at the latest please

B.B.: your correct, i don't work 24 hours in a day, but i do get 90-100 hours in about every pay period. i'm constantly tired. all i do is work, cause we are very short staffed, and if i don't come in, i risk losing my job, i don't need this, I will try to let you know if i can make it by friday's, but i cannot promise you that i can do it all the time. i hope you understand.

M.W.: This keeps going full circle….. [E.B.], my family and I do not benefit from pissing u off….. if I don't know by Friday's, I may not be home is all I'm saying….. I hope work gets better…..

This tension affected other aspects of the guardianship, which is evident when B.B.

asked about E.B. a few days later:

B.B.: how's [E.B.]?

M.W.: [E.B.] is fine.

B.B.: what has he been up to lately?

M.W.: Going to daycare…. Nothing new…. I'm working

B.B.: how does [E.B.] like daycqre?

B.B.: daycare *

M.W.: Good….. There's some kids there he is familiar with…. He hates getting dropped off and cries but he calms down quickly. Best part of my day is picking him up cause he gets super excited.

B.B.: that's adorable. and they treat him well?

M.W.: Yes, it's a private sitter.

M.W.: I don't mean at all to be rude but I promised to update u on sundays and send a picture…. I can't be messaging u during my work day & I work 8-430. Can we stick to Sunday's please. If something changes, like he walks, I will let u know.

B.B.: ok…

B.B.: never promised to just get updates on sunday's…

B.B.: never promised that .

B.B.: at all, i did say it'll be nice, but not just on sundays, that's weird, and i don't like that

M.W.: I'm sry u don't "like" it…. I'm working. I will not be responding during my work hours.

B.B.: and that's perfectly fine, if you don't want a message during your work time, then you could have said that, i'll message you when it's not work hours.  it's that easy !! sorry i like to be updated about my son. it's not as easy, i'd wish you'd understand that!

M.W.: You're right, I don't understand how u feel….. in the same breath u don't know how I feel either….. we agreed to take [E.B.] cause he needed a home but u have to remember we had and still have a life that we r trying to live as well….. U got upset with my short answers earlier and I promise, nothing changes on a daily basis… he may not be our blood but he is our son too and I feel like I'm constantly being checked in on by my mother….

Along with B.B.'s difficulties in attendance, there were other issues with the visits.   B.B. felt uncomfortable interacting with E.B. under the guardians' supervision.  When E.B. needed his needs met, he went to M.W. or T.W. or they intervened to assist E.B. rather than let B.B. care for him.  To help with her rising anxiety, B.B. often brought a third party with her to the visits.  M.W., however, believed the presence of others overwhelmed E.B. and caused him to cry.

Aside from the visitation issues, B.B.'s overall circumstances improved after she placed E.B. with the guardians.  She found employment as a crew member at a fast-food restaurant in February 2021 and was promoted to shift manager and then to general manager within eighteen months.  Her mental health improved, as she described in a May 2022 message to M.W.: "I'm doing really good.  I feel

better.  My mind is in such a better place."  As a result, B.B. told M.W. that she wanted to end the guardianship.[5]

In July 2022, B.B. moved to terminate the guardianship.  The court held evidentiary hearings in November 2022 and February 2023.  Shortly after the second hearing, the juvenile court entered an order terminating the guardianship.  The order included a transition plan and an effective termination date of June 1.  The guardians appeal.

**II. Scope of Review.**

Proceedings to terminate a guardianship are equitable, and our review is de novo.  *In re Guardianship of L.Y.*, 968 N.W.2d 882, 892 (Iowa 2022).  On de novo review, we look at the facts as well as the law and determine rights anew.  *In re Marriage of Full*, 255 N.W.2d 153, 156 (Iowa 1977).  But the lower court's ruling still bears weight:

> [A] de novo review does not mean the appellate courts decide the case in a vacuum, or approach it as though the trial court had never been involved.  Rather, even in a de novo appellate review, great weight is accorded the findings of the trial court where the testimony is conflicting.  This is because the trial court is in a far better position to weigh the credibility of witnesses than the appellate court.  Unlike this court, the trial court has a front row seat to observe the witness's facial expressions, vocal intonation, eye movement, gestures, posture, body language, and courtroom conduct, both on and off the stand, as well as the witness's nonverbal leakage demonstrating hidden attitudes, feelings, and opinions that are not reflected in the cold transcript this court reviews.  Consequently, the trial judge is in the best position to assess witnesses' interest in the trial, their motive, candor, bias, and prejudice.

---

[5] M.W. responded to the news that B.B. wanted to end the guardianship by informing B.B. that she could visit with E.B. as usual but that "[t]here will be no further contact through Messenger or other means."  But M.W. resumed exchanging messages with B.B. three days later.

*Albert v. Conger*, 886 N.W.2d 877, 880 (Iowa Ct. App. 2016) (cleaned up).

### III. Termination of the Guardianship.

#### A. Iowa Code chapter 232D.

We begin our de novo review with the law, which recently changed. *See L.Y.*, 968 N.W.2d at 892 (discussing adopting Iowa Code chapter 232D (2020)). The legislature passed the Iowa Minor Guardianship Proceedings Act in 2019, and the new law went into effect on January 1, 2020, just over a year before M.W. and T.W. petitioned for guardianship of E.B. *See* 2019 Iowa Acts ch. 56, § 44 (codified at Iowa Code chapter 232D). The statute provides two means for establishing a guardianship for a minor either: with parental consent or without parental consent. *See* Iowa Code §§ 232D.203 (establishing guardianships with parental consent), .204 (establishing guardianships without parental consent).

Perhaps because of the recent change in the law, it appears there was some confusion about the type of guardianship established for E.B. Although B.B. consented to the guardianship, the juvenile court used the criteria for a guardianship without parental consent in its order. *See id.* § 232D.204(1).[6] The

---

[6] Iowa Code section 232D.204(1) allows the court to appoint a guardian for a minor child without parental consent if it finds clear and convincing evidence showing:

    a. There is a person serving as a de facto guardian of the minor.

    b. There has been a demonstrated lack of consistent parental participation in the life of the minor by the parent. In determining whether a parent has demonstrated a lack of consistent participation in the minor's life, the court may consider all of the following:

        (1) The intent of the parent in placing the custody, care, and supervision of the minor with the person petitioning as a de facto guardian and the facts and circumstances regarding such placement.

order does not make the necessary findings to establish a guardianship with consent under section 232D.203.

The requirements for terminating a guardianship of a minor depend on the type of guardianship established. *Compare* Iowa Code § 232D.503(2) (terminating guardianships with parental consent), *with id.* § 232D.503(3) (terminating guardianships without parental consent). Having determined the guardianship was established under section 232D.204, we apply the criteria in section 232D.503(3) to determine whether it should be terminated. That provision allows the court to terminate a guardianship established without parental consent if the basis for the guardianship is not currently satisfied. *Id.* § 232D.503(3). The person seeking to terminate the guardianship must first make a prima facie showing that the guardianship should be terminated. *Id.* If that showing is made, the guardian must put forth clear and convincing evidence showing the guardianship should not be terminated. *Id.*

**B. Did B.B. make a prima facie showing?**

The guardians contend that B.B. failed her burden of showing the guardianship should be terminated. The bulk of their argument revisits the circumstances that led to the guardianship's creation: B.B.'s admission that her

---

(2) The amount of communication and visitation of the parent with the minor during the alleged de facto guardianship.
(3) Any refusal of the parent to comply with conditions for retaining custody of the minor set forth in any previous court orders.

The order establishing E.B.'s guardianship finds that M.W. and T.W. "have been serving as de facto guardians" of B.B. and "there has been a demonstrated lack of consistent parental participation in the life of [B.B.]"

mental health prevented her from caring for E.B. and her act of placing the child in their care. They also claim that B.B. neglected her duty to parent E.B. during the guardianship.

The court established E.B.'s guardianship under section 232D.204 based on two findings: (1) M.W. and T.W. "serving as de facto guardians" to E.B. and (2) "a demonstrated lack of consistent parental participation" by B.B. in E.B.'s life. The evidence, on its face, shows that those reasons no longer existed at the time the court terminated the guardianship. M.W. and T.W. still served as guardians to E.B., but they did so based on the guardianship order, not because B.B. refused to embrace her role as parent. B.B. told M.W. that she wanted to end the guardianship and care for E.B. again and filed this action to terminate it. B.B. also consistently visited E.B. and regularly asked about him. The guardians claim B.B. failed to take an active role in E.B.'s care during the guardianship, but they limited the role she played by controlling the length, frequency, and place of her visits.

Since the guardianship began, B.B. has improved her situation in ways that will allow her to resume custody of the child. She now earns ample income to provide for E.B., including health insurance and child care. Most importantly, her mental health has greatly improved, as the juvenile court noted:

> She feels stronger and better mentally. That is evident in her accomplishments with her employment, housing, and transportation. While she talked about still having anxiety, evidence makes it apparent that some of her anxiety stems from the guardianship situation and the [guardians]. She testified about having aspirations to going back to school to get her GED/HiSET and then going to college to major in psychology.

Based on these facts, we agree that B.B. showed the guardianship should be terminated because the reason it began no longer exists. *See In re Mann*, 293

N.W.2d 185, 190 (Iowa 1980) ("Parents are not to be denied custody for past indiscretions which do not demonstrate a present risk.").

### C. Did the guardians overcome the prima facie showing?

The guardians next contend that they overcame B.B.'s prima facie showing with clear and convincing evidence that the guardianship should not be terminated. They allege that B.B.'s life is "unpredictable and unstable," citing recent changes in her employment, housing, and relationship status.

The evidence shows that B.B. left her employment as general manager of a fast-food restaurant because the franchise owner did not treat the workers well. She quit the position after obtaining a job at a meat-packing plant. She was then hired as shift-manager at a different franchise of the same fast-food restaurant. Although the shift-manager job paid less than what she earned as general manager, she testified that her new job provides a better work environment and regular hours.

On top of changing employment, B.B. changed residence. B.B. was living alone in a Fairfield apartment until her lease ended in early 2023. When her lease expired, she moved into her mother's two-bedroom house in New Liberty. B.B. testified that the move allowed her to save money for a better residence for her and E.B. Although the move also placed her farther from where M.W. and T.W. live, B.B. arranged transportation for her visits with E.B. She also planned for E.B.'s daycare and medical care in the new location. The guardians are concerned about B.B. living with her mother, who has a history of methamphetamine use and a recent conviction. B.B. also acknowledges that she has had a difficult relationship with her mother in the past.

Finally, B.B. briefly dated R.S., who has recent criminal convictions and a history of substance abuse. B.B. claims that she ended the relationship after realizing it could endanger her ability to regain custody of E.B. She testified, "I wanted to prove to everyone that my child is my first priority." B.B. admits that she maintains a friendship with R.S., but the guardians suspect that she is still involved with him romantically. They argue that the relationship shows that B.B. does not recognize the dangers R.S. poses to E.B.

In its order, the juvenile court noted the concerns about B.B.'s housing, finances, and relationship with R.S. Although it acknowledged that "these are tangible concerns," the court found "they [are] concerns that many parents face on a daily basis who do not have a guardianship in place for their child." It concluded that the evidence did not satisfy the guardians' burden of proving the guardianship should not be terminated. We agree. We also note that the evidence presents only a theoretical danger to E.B. B.B.'s mother and R.S. could endanger E.B. *if* either were currently using drugs or involved in illegal activity, but there is insufficient record evidence supporting that assumption.

**D. Does the record support a presumption in favor of B.B.?**

In concluding that the guardians did not meet their burden, the court applied the presumption that a parent is preferred over all others as a child's guardian. The guardians contend that the parental preference, which was codified in the old statute governing guardianships, should not be afforded to B.B. because the legislature did not include the parental preference when it enacted chapter 236D. But the supreme court recently held the parental preference predates enactment of the old statute and survives its repeal. *L.Y.*, 968 N.W.2d at 894. "[M]ore

importantly, the parental preference is inseparably intertwined with the fundamental liberty 'interest of parents in the care, custody, and control of their children.'" *Id.* at 897 (quoting *Troxel v. Granville*, 530 U.S. 57, 65 (2000)).

> Parents' fundamental right to the care, custody, and control of their children is seemingly meaningless without a preference for parents who have never been adjudicated unfit over all others in guardianship proceedings. We presume that fit parents are acting in their children's best interests in seeking not only to establish but also to terminate a guardianship, and this presumption casts the burden of proving the contrary on the non-parent. Accordingly, when interpreting Iowa Code section 232D.503, courts must start with the rebuttable presumption that the child's best interests are served in the parent's custody as opposed to all others.

*Id.* at 898.

Because *L.Y.* involved termination of a guardianship established with parental consent, the guardians argue the holding does not apply to guardianships established without parental consent. But the presumption applies broadly to all actions under section 232D.503, the statute governing termination of guardianships involving minors. *Id.* The court did not make any distinction between actions terminating guardianships established with parental consent, *see* Iowa Code § 232D.503(2), and those terminating guardianships established without parental consent, *see id.* § 232D.503(3). But the presumption is only the starting point; the court acknowledged it is rebuttable. *L.Y.*, 968 N.W.2d at 898. The presumption is rebutted if the parent is not suitable and the child's best interests requires that the child remain in a non-parent's care. *See Northland v. Starr*, 581 N.W.2d 210, 213 (Iowa Ct. App. 1998). A parent is not suitable if the court finds the parent is unfit. *See Quilloin v. Walcott*, 434 U.S. 246, 255 (1978) (stating it would violate due process to interfere with the natural family unit without

some showing of unfitness and for the sole reason that to do so was thought to be in the children's best interests).  Thus, a finding that a natural parent is unfit in an earlier guardianship proceeding may reduce or eliminate the parental preference, provided there was a full evidentiary hearing.  *See In re Guardianship of Roach*, 778 N.W.2d 212, 215 (Iowa Ct. App. 2009); *In re Guardianship of Stewart*, 369 N.W.2d 820, 823–24 (Iowa 1985).  But that is not the case here.  E.B.'s guardianship was established under section 236D.204(1) based on M.W. and T.W. serving as E.B.'s de facto guardians and B.B.'s "demonstrated lack of consistent parental participation" in E.B.'s life.  The juvenile court never determined that B.B. was unfit.

The parental preference for custody is also lost when a parent takes "an extended holiday from the responsibilities of parenthood."  *Roach*, 778 N.W.2d at 215 (citation omitted).  Whether this threshold is met is "highly dependent on the individual circumstances presented" in each case.  *In re Guardianship of M.E.*, No. 16-1178, 2017 WL 2465791, at *7 (Iowa Ct. App. June 7, 2017).  Prior cases distinguish between situations in which parents seek temporary assistance caring for their children and those in which parents abdicate their parental duty over a long time.  *See generally id.* at *7–11 (reviewing cases).

> Our cases have emphasized that parents should be encouraged in time of need to look for help in caring for their children without risking loss of custody.  The presumption preferring parental custody is not overcome by a mere showing that such assistance was obtained. Nor is it overcome by showing that those who provided the assistance love the children and would provide them with a good home.  These circumstances are not alone sufficient to overcome the preference for parental custody.

*In re Guardianship of Sams*, 256 N.W.2d 570, 573 (Iowa 1977).

Unfortunately, a custody dispute arises often when parents obtain help in caring for their children from others. Those who provide the assistance from motives of generosity develop an attachment to the children which makes them reluctant to relinquish custody. However, parents must be encouraged to seek help with their children in cases of hardship or necessity, and ordinarily the long-range best interests of children are better served when they are returned to their parents at the end of the temporary exigency. In these situations the love of the temporary custodians for the children should be directed toward minimizing the trauma of dislocation rather than used as a premise for acrimonious custody litigation. It is a paradox that children may become victims of too much love.

*In re Burney*, 259 N.W.2d 322, 324–25 (Iowa 1977).

Although the juvenile court established the guardianship based in part on B.B.'s lack of consistent parental participation, the facts do not meet the threshold for forfeiting the parental preference. At first, the parties expected that the guardianship would lead to termination of B.B.'s parental rights and E.B.'s adoption. But B.B. did not terminate her rights as E.B.'s parent. Instead, she maintained contact with the guardians, asking about and requesting visits with E.B. B.B.'s desire for greater involvement in E.B.'s life caused conflict with the guardians because it indicated she did not intend to forfeit her right to parent E.B. See *id.* at 324 ("Abandonment involves a giving up of parental rights and responsibilities accompanied by an intent to forego them."). In considering whether the guardians met their burden of showing the guardianship should not be terminated, the court properly applied the preference in favor of B.B. as a natural parent and found the guardians fell short.

**E. Conclusion.**

Because the evidence shows that the guardianship should be terminated, we affirm the juvenile court's order.

**AFFIRMED.**